FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
            *Plaintiff-Appellee,*

      v.

GARLAND CALLUM,
            *Defendant-Appellant.*

No. 02-10210

D.C. No.
CR-98-40206-DLJ

UNITED STATES OF AMERICA,
            *Plaintiff-Appellee,*

      v.

STEVEN RAY HENDERSON, aka Ray;
Detail Ray,
            *Defendant-Appellant.*

No. 02-10242

D.C. No.
CR-98-40206-DLJ-
04

UNITED STATES OF AMERICA,
            *Plaintiff-Appellee,*

      v.

JOHNNY LEE BARNES, aka Darnell
Ferguson, aka J Fresh,
            *Defendant-Appellant.*

No. 02-10243

D.C. No.
CR-98-40206-DLJ

UNITED STATES OF AMERICA,
          *Plaintiff-Appellee,*

v.

DELVONNE MAURICE JENKINS,
          *Defendant-Appellant.*

No. 02-10471

D.C. No.
CR-98-40206-8-DLJ

OPINION

Appeal from the United States District Court
for the Northern District of California
D. Lowell Jensen, District Judge, Presiding

Argued and Submitted
August 12, 2004—San Francisco, California

Filed April 20, 2005

Before: Harry Pregerson and Alex Kozinski, Circuit Judges,
and John S. Rhoades, Sr.,* District Judge.

Opinion by Judge Kozinski;
Concurrence by Judge Pregerson

---

*The Honorable John S. Rhoades, Sr., Senior United States District
Judge for the Southern District of California, sitting by designation.

**COUNSEL**

Mark Rosenbush, San Francisco, California, for defendant-appellant Steven Ray Henderson; Richard B. Mazer, San Francisco, California, for defendant-appellant Garland Callum; Joyce Leavitt, Assistant Federal Public Defender, Oakland, California, for defendant-appellant Delvonne Maurice Jenkins; Michael Stepanian, San Francisco, California, for defendant-appellant Johnny Lee Barnes.

Rebecca C. Hardie, Assistant United States Attorney, Oakland, California, for the plaintiff.

**OPINION**

KOZINSKI, Circuit Judge:

The federal wiretapping statute requires court orders approving wiretaps to "specify . . . the identity . . . of the [Department of Justice official] authorizing the [wiretap] application." We decide whether suppression is required when wiretap orders and corresponding applications say nothing about who authorized them.

**FACTS**

The Drug Enforcement Administration (DEA) suspected defendants Barnes and Henderson of participating in a drug trafficking ring in Northern California. After unsuccessfully exhausting conventional investigative techniques, DEA agents

and Jeffrey Cole, the Assistant United States Attorney (AUSA) supervising the investigation, decided to ask the Department of Justice (DOJ) for authorization to apply for court orders permitting oral, wire and electronic surveillance. The AUSA started the process in August of 1998 by requesting authorization to bug Barnes's office. He received a DOJ authorization letter and presented it along with a wiretap application to a district judge, who signed an order authorizing the wiretap. The AUSA added phone and pager taps for Barnes in September, and taps on Henderson's cell phone and pager in October. The government's surveillance efforts proved successful, and defendants were indicted for conspiracy to distribute cocaine.

Defendants challenged the validity of the wiretap applications and court orders, contending that (1) the documents were facially insufficient because they didn't identify who at DOJ authorized the applications; (2) the applications had not been authorized by DOJ before being presented for approval to the judge who issued the wiretap orders; and (3) the affidavits accompanying the applications omitted significant facts relating to prior interceptions. The district court denied defendants' motions to suppress the intercepted communications, and defendants entered conditional pleas preserving their rights to appeal the court's rulings.

## ANALYSIS

**[1]** Interceptions of wire, oral and electronic communications are governed by Title III of the Omnibus Crime Control and Safe Streets Act of 1968, as amended, 18 U.S.C. §§ 2510-2522. In discussing Title III, the Supreme Court has noted that "Congress legislated in considerable detail in providing for applications and orders authorizing wiretapping and evinced the clear intent to make doubly sure that the statutory authority be used with restraint." *United States* v. *Giordano*, 416 U.S. 505, 515 (1974). This concern is evident from the Act's text, which restricts the criminal offenses that can justify a

wiretap or bug, *see* 18 U.S.C. § 2516(1), and includes a host of procedural safeguards to regulate interception of communications. *See Giordano*, 416 U.S. at 515.

When a law enforcement officer seeks a court order allowing him to set up a wiretap (or other means of surveillance regulated by Title III[1]), he has a long and bumpy road ahead of him. First, he needs authorization to apply for an order from the Attorney General or some specified and appropriately designated subordinate. *See* § 2516(1). If he receives DOJ authorization, the officer may then apply to a federal judge for a wiretap order. The application is anything but a formality; it requires the officer to provide specific information, including who at DOJ authorized the application, what facts support the need for wiretapping and "whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." *Id.* § 2518(1). If the judge presented with the application finds that it provides a proper basis for a wiretap, he may issue an order identifying the target and context of the wiretapping, the period of time during which interception is authorized and, most important for present purposes, "the person authorizing the application." *Id.* § 2518(4).

With court order in hand, the officer may begin intercepting communications. But criminal defendants aggrieved by the wiretap order may challenge its validity and seek suppression of the evidence obtained thereunder, which is where we find ourselves with these defendants.

### Facial Insufficiency

**1.** Defendants claim first that their communications should have been suppressed because they were intercepted pursuant

---

[1]For the covered modes of surveillance, see 18 U.S.C. § 2510. *See also* § 2516.

to facially insufficient wiretap orders and corresponding applications.

**[2]** We begin with the August order. It is undisputed that the order is silent as to who at DOJ authorized the application. This is problematic, because section 2518(4)(d) requires that "[e]ach order authorizing or approving [any covered] interception . . . shall specify . . . the identity . . . of the person authorizing the application." Further, section 2518(10)(a)(ii) calls for suppression of evidence obtained by surveillance when "the order of authorization or approval under which [a communication] was intercepted is *insufficient on its face*" (emphasis added).

Though the Supreme Court has not yet decided a case involving a facially insufficient warrant under section 2518(10)(a)(ii), two opinions interpreting Title III shortly after its enactment offer some guidance here. In *United States* v. *Giordano*, the Court considered the issues of who at DOJ could authorize wiretap applications under Title III, and whether suppression was required when an order was not properly authorized. At the time, the statute limited authority to "[t]he Attorney General, or any Assistant Attorney General specially designated by the Attorney General." *See* 416 U.S. at 513.[2] The order in *Giordano* stated that the wiretap application had been authorized by a specially designated Assistant Attorney General, but this was incorrect; it was really authorized by the Executive Assistant to the Attorney General. *Id.* at 509-10. The Court found that, despite the confusion, there was no facial insufficiency, as "the order, on its face, clearly, though erroneously, identified [the Assistant Attorney General] as the Justice Department officer authorizing the application, pursuant to special designation by the Attorney General. As it stood, the intercept order was facially sufficient under

---

[2]Title III has since been amended to allow authorization by a broader range of officials working under the Attorney General. *See* 18 U.S.C. § 2516(1).

§ 2516(1)." *Id.* at 525 n.14. Accordingly, the wiretap evidence was not suppressible under section 2518(10)(a)(ii).

The Court held that the communications were nevertheless "unlawfully intercepted," and thus subject to suppression pursuant to section 2518(10)(a)(i), because the Executive Assistant to the Attorney General, who had actually approved the application, lacked statutory authority to do so. In deciding that suppression was appropriate, the Court noted that "Congress intended to require suppression where there is failure to satisfy any of those statutory requirements that directly and substantially implement the congressional intention to limit the use of intercept procedures to those situations clearly calling for the employment of this extraordinary investigative device." *Id.* at 527. Applying this test, the Court was "confident that the provision for pre-application approval was intended to play a central role in the statutory scheme and that suppression must follow when it is shown that this statutory requirement has been ignored." *Id.* at 528.

In *United States* v. *Chavez*, 416 U.S. 562 (1974), decided the same day as *Giordano*, the Court dealt with a wiretap application and order that "incorrectly identif[ied] an Assistant Attorney General as the authorizing official" when the authorization had actually come from the Attorney General himself. *Id.* at 565. The Court again found that the misstatements didn't render the wiretap order facially insufficient under section 2518(10)(a)(ii), as "the interception order clearly identified 'on its face' [the Assistant Attorney General] as the person who authorized the application to be made. Under § 2516(1), he properly could give such approval had he been specially designated to do so by the Attorney General, as the order recited." *Id.* at 573-74. Moreover, because the Attorney General—a statutorily empowered official—had in fact authorized the application, the case differed from *Giordano*, and the communications were not subject to suppression for being "unlawfully intercepted" under section 2518(10)(a)(i): "Failure to correctly report the identify of the

person authorizing the application . . . when in fact the Attorney General has given the required preliminary approval to submit the application, does not represent a similar failure to follow Title III's precautions against the unwarranted use of wiretapping or electronic surveillance and does not warrant the suppression of evidence gathered pursuant to a court order resting upon the application." *Id.* at 571.

Reading *Giordano* and *Chavez* together, it is clear that the Supreme Court was far more concerned with the wiretap applications being authorized by an empowered DOJ official than with correct identification of that official in the wiretap applications and orders. The absence of valid authorization in *Giordano* and the presence of valid authorization in *Chavez* explain why suppression was ordered in the former case but not the latter.

One could plausibly read *Chavez*, as well as *Giordano*, as standing for the narrow proposition that a wiretap order is facially sufficient if (along with meeting the other statutory requirements) it identifies an authorizing official who is empowered under Title III to approve applications, even if that official was not the one who actually gave approval. This reading, however, is foreclosed to us by *United States* v. *Swann*, 526 F.2d 147 (9th Cir. 1975) (per curiam). In that case, we dealt with applications that incorrectly identified the authorizing source as an Acting Assistant Attorney General when the Attorney General himself had in fact approved the applications.[3] We recognized the situation was distinct from *Chavez*, as the Acting Assistant Attorney General was not listed in the statute as qualified to authorize applications. Because the applications identified a DOJ official who wasn't statutorily empowered to provide authority, we stated that "it

---

[3]We note that section 2518(10)(a)(ii) applies by its terms only to "order[s] of authorization or approval" that are facially insufficient. In *Swann*, however, we applied paragraph (ii) facial insufficiency analysis to wiretap applications. *See* 526 F.2d at 148-49.

may be argued that each application was 'insufficient on its face' " under section 2518(10)(a)(ii). *See id.* at 149. Even so, we held that the misstatement of authorization did not warrant suppression. Drawing on the opinions of several of our sister circuits, we held that the misstatement was merely a "minor facial insufficiency that does not substantially impair the accomplishment of Congress' purpose." *Id.* Thus, suppression was not required.

**[3]** Under *Giordano* and *Chavez*, a wiretap order can list an incorrect source of DOJ authority without creating a facial insufficiency, provided that the source listed is statutorily empowered to exercise authority. *Swann* goes a step farther and holds that even if the source listed had no authority to exercise, the resulting facial insufficiency still does not call for suppression.

**[4]** Against this backdrop, we conclude that suppression is not required based on any insufficiency in the August order. Here, rather than listing someone who was statutorily incapable of authorizing the application, the AUSA who prepared the order for the judge's signature listed no one at all. But this is no more a "substantial[ ] impair[ment]" of congressional purpose than identifying an unauthorized source.[4] In both cases, the wiretap order fails to mention a statutorily empowered source of authority. In both cases, the resulting order is facially insufficient. If listing an unauthorized source of approval is only a "minor" insufficiency that does not require suppression, it follows that listing no official at all is also a minor insufficiency for which suppression is not the appropriate remedy.

**[5]** As for the argument that suppression is required based

---

[4]Indeed, in some ways listing no one is better than listing an unauthorized source; in the latter scenario, the issuing judge might more easily be misled into thinking there was valid DOJ authorization when there was not.

on a facial insufficiency in the August wiretap application, the district court found that the issuing judge had been presented with written DOJ authorization for the wiretap before he signed the order. The authorization was thus part of the wiretap application, and the application was facially sufficient.

**2.** The government also intercepted communications under two subsequent orders, one applied for in September and the other in October. Defendants challenge the facial sufficiency of these orders and the corresponding applications for failing to properly identify the authorizing source at DOJ.

**[6]** The September and October orders state that they were authorized by "the Assistant Attorney General in charge of the Criminal Division, United States Department of Justice, pursuant to the power delegated [to] her by special designation of the Attorney General." Though the authorization for the orders actually came from the Deputy Assistant Attorney General, a specially designated Assistant Attorney General is statutorily empowered to provide authorization.[5] *See* § 2516(1). These facts are on all fours with *Chavez*, and suppression is not required.

**[7]** Regarding the corresponding wiretap applications, neither application states that it was approved by any official at DOJ. As with the August wiretap, however, the district court found that the issuing judge was presented with written DOJ authorization before signing the September and October orders.[6] The written authorization constituted part of the applications, and the district court thus correctly determined that suppression was inappropriate.

---

[5]A properly designated Deputy Assistant Attorney General is likewise empowered to authorize wiretap applications. *See* note 2 *supra*.

[6]As discussed below, we reject defendants' challenges to these findings. *See* pages 4427-28 *infra*.

## Compliance with Authorization Requirements

**1.**  Defendants next argue that the AUSA presented the September wiretap application to the issuing judge for approval before receiving DOJ authorization. If defendants are correct, suppression of the intercepted communications is required; as the Supreme Court stated in *Giordano*, DOJ authority must "be exercised *before* the application is presented to a federal judge." 416 U.S. at 523 n.12; *see also United States* v. *Reyna*, 218 F.3d 1108, 1112 (9th Cir. 2000) ("The statutory sequence of wiretap authorization makes it clear that prior authorization by senior executive branch officials is an express precondition to judicial approval under § 2516; its violation merits suppression.").

The basis for defendants' claim is that the issuing judge listed the time he signed the wiretap order as 3:00 p.m., nearly half an hour *before* the timestamp on the fax that constituted DOJ's written authorization of the application.[7] To investigate the timing discrepancy, the district court conducted an evidentiary hearing. The AUSA who presented the application to the judge submitted a declaration stating that, consistent with his usual practice, he waited until he received DOJ approval before seeking judicial authorization for the September wiretap. The court also considered the testimony of the DEA agent who provided the affidavit supporting the application. The agent testified that the AUSA told him the documents they presented to the judge, and which they watched the judge review before he signed the order, included DOJ approval of the wiretap application.

Ultimately, the district court concluded that the issuing judge had viewed the DOJ approval before signing the wire-

---

[7]The fax lists 6:29 p.m. as the sending time. Because the machine from which the fax originated was in Washington, D.C., in the Eastern time zone, the time translates to 3:29 p.m. Pacific Time at the U.S. Attorney's office in San Francisco, where the fax was received.

tap order, and that the most reasonable explanation for the timing discrepancy was an error on the judge's part. This finding of fact is entitled to deference, and we review only for clear error. *See United States* v. *Scott*, 74 F.3d 175, 176 (9th Cir. 1996) ("Generally, we review a motion to suppress de novo and the trial court's factual findings for clear error."). To hold that the district court's finding was clearly erroneous, we must have a "definite and firm conviction that a mistake has been committed." *Concrete Pipe & Prods., Inc.* v. *Constr. Laborers Pension Trust*, 508 U.S. 602, 623 (1993) (quoting *United States* v. *United States Gypsum Co.*, 333 U.S. 364, 395 (1948) (internal quotation marks omitted)).

**[8]** We have no such conviction. The wiretap order, which was signed by the judge, indicated that he knew of the DOJ authorization before issuing the order. The AUSA's declaration likewise stated that the AUSA had waited for DOJ authorization and presented it to the judge when seeking issuance of the wiretap order. And the DEA agent corroborated the story. Given this evidence, we cannot say that the district court clearly erred in concluding that the issuing judge viewed the DOJ's authorization of the September wiretap application before he signed the wiretap order.

**[9]** We likewise affirm the district court's ruling that the October wiretap order was not issued before the judge reviewed DOJ authorization. The court had a similarly robust evidentiary basis for reaching its conclusion.

**2.** Defendants claim that the district court improperly denied their motions to depose the issuing judge pursuant to Federal Rule of Criminal Procedure 15 or subpoena him to appear at the evidentiary hearing pursuant to Rule 17(b), as well as their request to examine the AUSA. They contend they could have elicited testimony suggesting that the judge signed the wiretap orders without having viewed DOJ authorization of the wiretap applications.

We review the district court's rulings for abuse of discretion, *see United States* v. *Omene*, 143 F.3d 1167, 1170 (9th Cir. 1998) (Rule 15); *United States* v. *Etimani*, 328 F.3d 493, 501 (9th Cir. 2003) (Rule 17(b)), and find none. Defendants merely assert it is possible that examining the issuing judge could have turned up "relevant" information bearing on whether the wiretap applications were authorized by DOJ before they were presented to the judge. The district court did not abuse its broad discretion in refusing to authorize this fishing expedition.

## Lawfulness of Wiretap Applications

[10] **1.**    Defendants contend that the wiretap applications were unlawful because the preparing officers intentionally or recklessly omitted the fact that two of the surveillance subjects had been targeted by a prior wiretap. Such an omission, if intentional, would violate section 2518(e) and require suppression. *See United States* v. *Lujan*, 936 F.2d 406, 409 (9th Cir. 1991) (per curiam). Defendants argue that a reckless omission should have the same effect. We need not address that issue, however, because the district court did not clearly err in finding that the government had acted neither intentionally nor recklessly in omitting information about prior interceptions. *Cf. id.* at 409 ("Findings of fact concerning misleading statements and omissions . . . are reviewed under the clearly erroneous standard.").

**2.**    Finally, defendants claim the district court improperly denied their request for an evidentiary hearing under *Franks* v. *Delaware*, 438 U.S. 154 (1978). They argue a *Franks* hearing would have helped them prove that the August application and order misstated material information about the need for a wiretap.

[11] "A defendant is entitled to a [*Franks*] hearing if he makes a substantial preliminary showing that a false statement was deliberately or recklessly included in an affidavit submit-

ted in support of a wiretap order, and the false statement was material to the district court's finding of necessity." *United States* v. *Staves*, 383 F.3d 977, 982 (9th Cir. 2004). Here, defendants made no such showing, and their request for a *Franks* hearing was thus properly denied.

## CONCLUSION

Under the force of precedent, we uphold the challenged wiretap applications and orders. Still, we note that the Department of Justice and its officers did not cover themselves with glory in obtaining the wiretap orders at issue in this case. Title III is an exacting statute obviously meant to be followed punctiliously, yet the officers repeatedly ignored its clear requirements. The sloppy handling of Title III's procedures by the United States Attorney's Office for the Northern District of California bespeaks a lamentable lack of supervision. *See United States* v. *Kojayan*, 8 F.3d 1315, 1320 (9th Cir. 1993). We trust that this problem has been corrected, and that we will not see such errors in the future.

**AFFIRMED.**

---

PREGERSON, Circuit Judge, with whom RHOADES, District Judge, joins, specially concurring:

Although I concur in Judge Kozinski's opinion, I write separately to emphasize my deep concern with the careless and irresponsible handling of the wiretap applications by the U.S. Attorneys' Office and the U.S. Department of Justice. There were three wiretap applications involved and the government didn't get one right.[1] The very purpose of requiring that some

---

[1] In the first application and order, the government failed to include the name of the authorizing official on either document—although the government did provide a separate letter from the appropriate DOJ official who authorized the wiretap, which the issuing judge had before him when he signed the order. The other two applications also omitted the authorizing DOJ official and their corresponding orders each named the wrong official.

high ranking official at DOJ review a proposed wiretap application is to ensure that before a court is asked to issue a wiretap order, alternative, less intrusive methods of obtaining the same evidence are considered. Yet, under the rubric of "harmless" or "minor" error, the courts excuse prosecutorial misconduct that flouts people's constitutional rights. By so doing, courts fail to hold the government to the high standard set not only by the wiretap statute, but by professional codes of conduct. *See* Model Rules Prof'l Conduct R. 3.8 cmt. [1] (2003) ("A prosecutor has the responsibility of a minister of justice and not simply that of an advocate. This responsibility carries with it specific obligations to see that the defendant is accorded procedural justice and that guilt is decided upon the basis of sufficient evidence."); ABA Standards for Criminal Justice 3-1.1(b) (3d. 1993) ("The prosecutor is both an administrator of justice and an advocate. The prosecutor must exercise sound discretion in the performance of his or her functions."); *id.* at 3.1-1(c) ("The duty of the prosecutor is to seek justice, not merely to convict."); *see also Hayes v. Brown*, 399 F.3d 972 (9th Cir. 2005) ("The prosecuting attorney represents a sovereign whose obligation is to govern impartially and whose interest in a particular case is not necessarily to win, but to do justice. . . . It is the sworn duty of the prosecutor to assure that the defendant has a fair and impartial trial.") (quoting *Commonwealth v. Mendiola*, 976 F.2d 475, 486 (9th Cir. 1992) (citations omitted), *overruled on other grounds*, *George v. Camacho*, 119 F.3d 1393 (9th Cir. 1997) (en banc)).

These codes of conduct require that prosecutors set an example by showing respect for, and adherence to, the civil liberties protected by our sacred Constitution. Rather than ensure that the constitutional rights of wiretap targets were not violated and that Congress's intent was respected, the AUSA and DOJ handled the wiretap applications in a cavalier and careless manner. Sadly, under the force of precedent, we are obligated to affirm the district court. I too hope that such

gross mishandling of wiretap applications has been corrected, and that we will not see such errors in the future.